W. B. DORAN, Appellee, v. WATERLOO, CEDAR FALLS & NORTH-
ERN RAILWAY COMPANY, Appellant.

**MASTER AND SERVANT:** Safe Place to Work—Sanding Street
1  Car Tracks—Negligence. A master must furnish his servant a
reasonably safe place in which to work and must keep it reasonably safe. *Held* a jury question, in instant case, whether

the master had failed to meet its duty in this respect and was negligent by reason of not having sanded its tracks or equipped its cars with sanding devices, and thereby prevented an approaching car from sliding through a car barn door and injuring the servant working therein.

**APPEAL AND ERROR:** Trial—Exclusion of Evidence Otherwise Brought Out. Error cannot be predicated on the exclusion of evidence pertinent to the issues when such evidence was fully brought out in other portions of the witnesses' testimony.

**WITNESSES:** Ancient Rule Against Impeaching One's Own Witness—Modification Recognized. It is an, ancient rule that one may not impeach his own witness even by showing that the witness has made statements out of court inconsistent with his statements in court. But when a party to an action has been deceived, apparently with deliberation, into calling a witness to the stand under the bona fide belief that he would testify to a certain state of facts and the witness proceeds to testify squarely to the contrary, the party calling such witness is not entirely helpless. In instant case, the reading of the written testimony of the witness (taken on a former occasion) ''in order to refresh his memory'' and set counsel right with the jury was approved.

**TRIAL:** Instructions—Stating Grounds of Negligence—Non-necessity to Repeat. After the court has once clearly stated the grounds of negligence upon which plaintiff's cause of action is predicated, it is not necessary to continue to repeat them in subsequent paragraphs.

**TRIAL:** Instructions—Stating Affirmative and Negative Proposition—Sufficiency. The reverse of an affirmative proposition need not necessarily be elaborated with the same fulness as was employed in stating the affirmative. For instance, the jury was sufficiently guided where it was told that if they found that the defendant street railway company should have sanded its tracks, in the exercise of reasonable care, and did not do so, and that the injury was the proximate result of such failure, and that the injured party was not negligent, then he could recover, ''otherwise not.'' The two latter words, under the record in case at bar, and to a juryman of common understanding, clearly suggest and state the reverse of the proposition immediately preceding.

**MASTER AND SERVANT:** Concurrent Negligence of Fellow Servant and Master—Statement of Rule—Instructions—Hypercritical Objection. The following instruction is held to sufficiently and correctly state the Concurrent Negligence Rule: ''If plaintiff

was injured as a result of the negligence of said motorman alone and without any fault or negligence on the part of the defendant company, then plaintiff is not entitled to recover. . . . If, however, the motorman was negligent and the defendant was also negligent as alleged, and if plaintiff, without contributory negligence on his part, was injured as the direct and proximate result of the concurrent negligence of said motorman and defendant, then plaintiff is entitled to recover.''

**TRIAL: Instructions—Placing Undue Emphasis on Certain Evidence.** Instructions should not unduly emphasize certain evidence to the exclusion of other equally relevant evidence, but *held*, rule not violated.

**TRIAL: Instruction Inartificially Drawn—Test to Apply.** An inartificially or clumsily drawn instruction does not necessarily demand a reversal. Instructions must not be considered abstractly and apart from the record to which they are applied. The subject-matter must always be kept in mind. They are sufficient if, to a man of ordinary intelligence, a correct understanding of the law is given in the charge as a whole. Instruction reviewed, and *held* not to misdirect the jury as to what negligence would render the defendant liable.

DEEMER, C. J., and SALINGER, J., dissent as to the construction placed on the instruction in question.

*Appeal from Bremer District Court.*—HON. C. H. KELLEY, Judge.

TUESDAY, JUNE 22, 1915.

ACTION to recover damages for personal injury. Judgment for the plaintiff. Defendant appeals.—*Affirmed.*

*Ainsworth & Hughes* and *Wade, Dutcher & Davis,* for appellee.

*Hagemann & Farwell* and *C. E. Pickett,* for appellant.

GAYNOR, J.—At the time of the happening of the accident complained of, defendant operated an electric railway in Waterloo, Iowa, and had two lines of electric interurban railways running out of Waterloo to Cedar Falls and Waverly, respectively. Broadway is a public street in the city of

Waterloo and runs east and west. About 300 feet east of Broadway, the defendant maintained a car barn for the storage of its electric cars and also its interurban cars. There are four tracks leading from the street railway line on Broadway to this car barn. For convenience, we will number them from the north, 1, 2, 3, 4, the south track, No. 4, being the one on which it is claimed the accident occurred. This barn faces to the west, and there are sliding doors in the barn over each track large enough to permit a car to pass through and enter the barn. In the large door, over track 4, there is cut a small door in the north half of the large door. This is for the purpose of enabling people to pass in and out of the barn without opening these larger doors.

For about three years prior to the accident, plaintiff had been in the employ of the defendant as car repairer. His usual work was at the shops about three-quarters of a mile from this barn. He, however, during that time had been frequently called to this barn to make repairs. About nine o'clock on the 4th day of January, 1911, the plaintiff was requested by the defendant to come to this car barn and take charge of it in place of the foreman. About 12:50 A. M. on the morning of January 5, 1911, the plaintiff was at his desk in this barn looking over the report of the motormen, and engaged in and about his duties, when he heard a car approach, and went to the small door over track 4 (this being the south track), and was about to open the door when a street car, driven by defendant motorman, Hartman, crashed into and through the door, pushing it in, and pinned plaintiff against another street car standing some two or three feet inside the door. The car that ran into the barn was a single-truck street car, under 32 feet in length, weighing about 8 tons. It was equipped with the usual controllers for throwing off and on the electric current and for reversing the car, and had a standard hand brake which operated upon four wheels, but the car did not have any sand equipment thereon, nor did it have an air brake. This car, operated by Hart-

man, was brought over these tracks from Broadway, for the purpose of housing it in this barn.

The evidence tends to show that after Hartman left the main line and entered upon these tracks leading to the barn, and after the conductor, Dougherty, threw the switch on the Broadway line, the car then proceeded to the next switch, passing over a track curving south and west, and there stopped while the conductor opened the switch. The next switch was open, and he went through that and stopped between the second and third switch. The conductor opened the third switch and he went through upon the line of the fourth track. As they got near the barn, the conductor got off and walked ahead to open the door, probably 8 or 10 feet ahead. The mortorman attempted to stop the car and found the wheels were slipping, and then. attempted to stop it by reversing the power. The last switch is about 140 feet from the barn. When he got within 30 or 40 feet from the barn, he noticed that the wheels were sliding. He then threw off the brake and reversed the current. There is no evidence that the track was slippery at any other point that night, or that the motorman had any trouble with the car slipping on that evening prior to this time. It appears that this track from Broadway to the barn is a level track; that, after the car left the last switch on its way to the barn, it was running from three to four miles per hour.

There is no controversy as to the fact that plaintiff was injured by being crushed between the car in question and the car inside the barn. There is no question in this case as to any contributory negligence on the part of the plaintiff. The charge of negligence made by plaintiff against the defendant, and as submitted to the jury, is substantially as follows: A failure to put sand upon the track when this car approached the barn at a point where the car was compelled to stop, and in failing to equip the car which caused the injury with a sand box or sand equipment so that sand could be put upon the track by the motorman; and in operating

this car without sand or sand equipment upon a slippery track at said place and at too great a rate of speed, in view of the condition of the track and the lack of sand or sand equipment as aforesaid. There was a general denial of negligence on the part of the defendant. Upon the issues thus tendered, the cause was tried to a jury, a verdict rendered for the plaintiff and judgment entered upon the verdict, and from this defendant appeals, assigning error on the part of the court.

In consideration of this case, we will not review the alleged errors in the order in which they are set out in defendant's brief. Defendant assigns twenty-nine errors. The first seventeen errors relate to the admission and rejection of testimony. The eighteenth error assigned relates to the action of the court in refusing to sustain defendant's motion for an instructed verdict. The balance of the errors relate to the action of the court in giving certain instructions on its own motion, and in refusing certain instructions asked by the defendant, together with the complaint that the verdict is grossly excessive and is the result of passion and prejudice.

At the conclusion of all the evidence, the defendant moved the court to direct the jury to return a verdict in favor of the defendant, on the ground that the evidence failed to show any actionable negligence on the part of the defendant, and that the evidence affirmatively showed that the defendant was not negligent in any of the matters charged against it by the plaintiff in his petition. The court having overruled this motion, and error being predicated upon the action of the court in so doing, we will consider this assignment of error first.

It appears that the street car was operated by one Hartman; that it was a single-truck car, less than thirty-two feet long and weighing about eight tons; that the track from Broadway to the barn was practically level; that this night was cold; that there was no snow on the ground, but the air was hazy and frosty.

Hartman testified that he took charge of this car somewhere between four and five o'clock in the afternoon preceding the day of the accident, and had operated it continuously up to the time of the accident; that it was in good working order; that he did not discover that the rails were slippery at any time preceding the accident; that the car began to slide after he attempted to stop it at the barn; that that was the first time he noticed that the rails were slippery; that he observed nothing that called his attention to the fact that the rails were slippery until he discovered that the car was sliding towards the barn after he set the brakes; that after he discovered this he let the brakes off, reversed the power, but still the car slid into the barn; that he was about 20 feet from the barn when he reversed the power. He says he might have been a car's length; that he did not notice closely on that point. He says he slid a little before he reversed the power; that there were bright lights at the barn, a cluster at the corner. He saw the barn doors were closed when he turned off the main line, and as he approached the barn. After he turned off the main line, he was running three or four miles an hour, but supposed he had perfect control of the car. He had one hand on the controller and one hand on the brakes. He says that after the conductor opened the third switch he went right up the line on track 4; that the conductor rode. As he got near the barn, the conductor got off and walked ahead to open the switch, probably 8 or 10 feet ahead. At the time the conductor got off, he was reversing the car. He attempted to stop it by reversing the power after discovering the wheels were sliding. He said the rails on a street railway track were likely to be slippery, if it was just commencing to rain or if the frost was just going out or freezing out; that the slippery condition of the rails is produced by weather conditions. Some days, he says, they find slippery rails; other days, not. When the weather conditions are right, they find it on part of the tracks. It depends upon the weather a good deal. Cannot tell

whether you are going to find a slippery rail on a cold day. He says he does not know of anything further he could have done to stop the car that night. After he discovered the wheels were slipping he did everything he could; that, ordinarily, on a dry rail, by the application of a hand brake, you could stop a car in six or eight feet, when running three or four miles an hour. There isn't much difference in stopping on a dry rail or a sanded rail.

Robert Davidson, called for the plaintiff, testified:

"I was standing at the desk, about eight feet south of this door. Saw nothing until I heard the crash. The door was smashed in the center and came right in, and Doran was pinned between it and the end of the car standing inside of the barn."

Scott Lamb, called for the plaintiff, testified:

"I am superintendent of the defendant company. Have been since last December. Have charge of the motor power department, operating department, power plant, substations, tracks, bridges and buildings. When I heard that Doran was injured, I went to the car barn on a local car which I ran myself. The car ran in on track 4 and stopped right behind the car that smashed into the barn. I bumped into it. The reason I bumped into the car was the slippery rails. I do not know how far back they extended. The night was dark and cold and hazy. It had not been so cold in the day, but it was getting colder. At the time of the accident it was quite cold. I don't think there was any wind. It was rather hazy and frosty. I did not notice any slippery track until I bumped into this car. I tried to stop the car and the wheels slid. They did not revolve. My car at the time had been moving about three miles an hour. On an ordinary rail I could stop within a few feet. I had concluded to stop about six feet from the car. The momentum of the car caused it to slide after the wheels were locked. I have seen frost settle when the rail

would not be slippery. A slippery rail is not uncommon. It is recognized in the street railway business, and we sometimes have slippery rails in the winter, and when we do, after the wheels are set with a brake, the car will skid from its own momentum. How far it will slide depends on how fast it is moving and the grade."

A. W. Bottine, called by the plaintiff, testified:

"I had been on duty that night from 5:00 o'clock until about 12:15, when I took my car in the barn. I had not noticed or observed the condition of the tracks that night until after the accident, I then observed that the rail was slippery. Especially, when I saw Lamb's car come in after the accident. I saw him coming. The switches were lined for him. He came real slow and ran his car within eight or ten feet of the other car; applied his brakes, but the car kept on sliding, and hit the Hartman car. The brakes on the Hartman car were set tight, and Lamb's car gave it quite a jar. Lamb was not running, at the time, over a mile an hour."

He was asked this question:

"What do you know about the matter of sanding the rails on slippery places and on inclined places, around through the city of Waterloo prior to that time?" A. "Well, there had been sanders out. Men to sand the rails at curves, slippery rails on pavement and railroad tracks. I don't think I saw any out that day. I have seen them at other times. I had not observed any slipperiness on the tracks. I was conductor. However, I knew my motorman had occasionally slipped past passengers who complained that they couldn't get on the car."

Robert Davidson, called for the plaintiff, testified as follows:

"I have been a motorman five and one half months on defendant's lines. It is very difficult for a motorman to tell by looking at a track ahead whether the wheels will slide, and it is impossible to tell whether they will slide when the brakes are set, unless you have been over the track. The only way I know of learning whether the rail is slippery is when the wheels actually slide after the brakes are set. How far it will run depends upon the speed. Sometimes a rail is so slippery it is almost impossible to stop. I know of no other method used by defendant to make the rails so that the car could stop on them when they became slippery, except by using sand. When they were found slippery this fact was reported to the company, and the company sanded them if it was a dangerous place. This is the only way I know of by which the company could have knowledge of the condition of the track."

W. A. Miller, called by the plaintiff, testified that he lived in Davenport. Was formerly in the street railway service in Davenport. Had been so engaged for about seven and one-half years. Was familiar with the method employed by street railways in sanding tracks. He was asked this question:

"Describe these different methods. A. There is a rule with all street car companies to take care of the rails. That is, it is that the cars are in good condition, you know. But on grades and hills, where they go down and up grade, it is a rule to have a man sand these tracks with a spoon or a shovel out of a pail. Q. Then what other way is there of sanding the tracks? A. They use a small sandbox on every car, having boxes on each end of the car. When the man fails to sand these spots—suppose it is in the morning early before the man is out—they have a pail and they use this sand by turning on a little faucet here, just the same as you would turn on a water faucet. The faucet is just to the right of the motorman. He has got his brake and his controller on

his right hand, and this little faucet is right there where he can loosen his control handle and turn on the sand. There is a little rubber tube that runs down and sands about so close to the track, and it throws a little stream of sand on the rail, perhaps as large as my finger. Q. Then what other devices have they used in the last five or six years in sanding the tracks? A. They use a small box, only it is a more modern pattern, a device so there is more pressure to the sand to get it out faster. The pressure is applied by air connected with the air brake. To stop a car on a slippery track, the first thing is to reverse the power; the brake cuts no figure until the motorman has done that. Then the motorman gradually throws on a brake so as to give the wheels a chance to act from this reverse and the sand, and then the current reverses it. The throwing of the brake does no good until you get sand on it. These sand devices that I speak of, that use air power, cannot be used upon cars that are not equipped with air. Davenport is the only place where I worked on street railways. That is a hilly town and the grades are steep. When the weather was bad and there was a little snow or dampness to make the rails sweat, then the sand man had to sand these grades. There was no necessity of sanding on level tracks. It was only upon the grades. It did not require sanding upon the track upon a level grade to stop a car with a hand brake upon an ordinary rail. A motorman might find a dry rail upon one part of the track, and in the next block a slippery rail. It is impossible for him to tell in advance where he will find a slippery rail. The only way is by stopping on a slippery rail. The only cars that I am familiar with, other than the Davenport line, is the I. & I. Interurban, whose lines end at Davenport. The I. & I. cars are double-truck cars, with extra heavy pressure of air.''

O. S. Lamb, superintendent of defendant company, for and in behalf of the defendant, testified touching this matter:

"I have had some experience as a motorman. Some of the single-truck cars on defendant's road were formerly equipped with sand devices. The equipment was taken off, most of it prior to my employment. I took some off after I came to the company. The sand equipment was taken off of practically the same type of cars as car '45, the one that caused the injury. The cars from which the sand equipment was taken were equipped with the same kind of brakes as car 45. It was taken off because it was never used. The reason it was never used was because it was not practical. We had too much trouble with it. It was impossible to keep the sand dry; though dried and put in boxes, it would collect moisture, and the pipe from the sand box to the rail would get stopped up, and would not work at times when the motorman depended upon it. There was more likelihood of trouble with it than without it; it was never ready when wanted; there was no way to keep it dry. There is no way on a gravity sander to keep the sand dry and have it work. In a gravity sander the sand runs from its own weight from the pipe to the rail. In air sanders the sand is blown by air pressure from the air trap into the pipe, and then onto the rail. Our interurban cars are equipped with air and air sanders. Sand is not necessary on a level grade. On level grades, such as we have in Waterloo, we do not use it on our street cars. We use sand at certain places on the rails. It is a necessary thing to put it on the rails in places in some manner. That is because we sometimes have slippery rails and cannot stop without sand. When you come to a stop, and the wheels are locked with a brake, if the track is slippery, the car may run fifty or it may run one hundred feet. The slippery condition is caused by weather and changes in weather, and it cannot be anticipated; the frost or dampness comes and you have got a slippery rail. When you have a slippery rail and you want to stop the car on a grade, you have to sand it. If the wheels are locked on a slippery rail at a place where the track is level, the car will slide, but if the brakes are not wound up

tight enough to lock, a little more time in stopping is taken. The car will stop all right on a slippery rail, but if the motorman runs on a slippery rail and locks his wheels by the brake, he will slide even on a level track. The tracks in front of the car barn were in an open space, and were affected by weather, the same as the rest of the track, and at times would get slippery. These tracks were used by many cars every night, which had to stop before reaching the barn, after they had left the main line. Ordinarily, the cars had to stop after they passed through the last switch before they got into the barn.''

This witness, further speaking of the gravity sanders which had been taken off the cars, said:

''The sand boxes were inside the car in the dry. The cars were heated with electricity. When we put the sand in it was dry, and the pipes were cleaned out. When we first put it in, it would run out all right. The boxes would hold about two buckets of sand. It would last something like a week or so. The cars were run in all sorts of weather and would get damp. We had a dryer for it before putting it in. It ran through a pipe with a two-inch opening in the top and a three-quarters inch at the bottom. I would consider that a proper pipe. It didn't tend to pack the sand. The pipe did not run full of sand. I never tried to have the sand taken out each night and dried and put back for the next day, or even three days. Never tried to refill the sander every morning with dry hot sand. After we took these sanders off, whenever there was a place that needed sanding, the motorman would report it and we would sand it. We had a man for that purpose. They never went out unless we sent them. When we directed them to sand, it was their duty to, and they did, sand the tracks. There were only two places where we deemed it necessary to sand when the weather conditions required it. One of these was the Illinois Central crossing on Water street. It was down grade to this crossing. The view

is shut off. The crew cannot tell when a train is coming. We keep it sanded on account of emergencies. The other is the ticket office in which are the main waiting rooms. People congregate there. The cars are stopping, coming in and going out. Someone is likely to step in front of the cars. These places are sanded when they are getting slippery. I deem the cars safer without these gravity sanders on a level track because the motorman depends upon the sand in case of an emergency. If a motorman relies upon the sand to stop, and the sand doesn't work, he is lost, he is going to get hurt. You can rely on air sanders ninety per cent of the time. A motorman who doesn't have sand approaches a place of danger with his car under control. It is impossible to tell whether tracks are slippery until the wheels slide. Our tracks in front of the waiting or ticket room are level, and we use sand there, because we have to stop suddenly. Sand was kept at the waiting station, at the shops, and at the car barn. It was brought from the dryer at the shops. I knew the tracks in front of the barn were unused except as the cars finally came in to go into the barn. I knew the tracks lying outside would be covered by frost in the course of one-half or one hour, and that frost sometimes makes the rails slippery. I didn't direct anyone to sand these tracks."

James M. Maxey, testifying for the defendant, said:

That for twenty years he had been connected with the Des Moines City Railway Company. During the first ten years was motorman. Since then has been assistant master mechanic; that during the ten years he was motorman he had experience in operating sand devices on cars; that "at the present time all Des Moines cars are double-truck cars, and on all cars where they have air brakes they use air sanders; on others the hand or foot sanders. The foot sander consists of a bowl which sets inside of the car and holds a couple of pails of sand. It tapers at the bottom where there is a sliding valve to which there is a rod attached. The other

end is attached to a lever above the floor. When the motorman steps on the lever it pulls the slide. A spring returns the valve to its place. There is another kind of valve on a foot sander which consists of a ball which is raised by a lever. The greatest drawback to the sander is that the end of the hose that follows the rail is bound to get damp on a drizzly day, and if it gets damp two or three inches up the spout, the sand clogs and it won't work, but the motorman can knock it out with a switch rod by hitting the hose. A wire hose is generally used. It is the slushing up from the bottom that wets the hose. Quite frequently a motorman relies upon his sand, and it doesn't work, where if he didn't rely upon it he would take a little more time to stop. We have been experimenting with these gravity foot sand devices for fifteen or sixteen years. We now use them solely on double-truck cars. These sanders fail when we need them most. They fail in rainy wet days, when there is dampness. From my knowledge, the use of gravity sanders on cars like the one in question, I would say that the sander is so unreliable that such cars would be safer in operation when not equipped with such gravity sander. Sand is very essential on a grade or a hill or a slippery place, where you have to stop. There should be sand if you can get it there. The reason we experiment with sanding devices is to get something that we can depend upon. The Des Moines Company run one hundred cars, and all have sand equipment, or, rather, we have tried to have sand equipment. We didn't always get it to work. Excepting on light open-face cars, Des Moines has used sand equipment for the last fifteen years. All double-truck cars had sand equipments until a year ago. The company doesn't use any single-truck cars without equipment. When I commenced with the company twenty years ago, thirty of those cars didn't have sand equipment. During the last fifteen years the single-truck cars did have sand equipment and we aim to keep sand in the box, and when it wasn't stopped up we used it. A motorman cannot always tell when it is stopped up. The air brake is the

most modern invention for heavier cars. Des Moines has no' single-truck cars in operation at the present time. Des Moines is a very hilly town. There are still a few cars, equipped with air brakes, on which we are still using the gravity sander. We do not sand the level tracks in Des Moines by hand at all only on the hills.''

F. J. Hanlon, called for the defendant, testified that he was manager of the Mason City & Clear Lake Railway Company, and had been for fifteen years; that it was an interurban road. He said he had run lots of electric cars but never worked as motorman. He said it was his opinion that single-truck street cars should not be equipped with sanding devices; that it tended to careless operation, but said a good many street railway companies used sand equipment; that his company used it on heavier cars; that some of the sand equipment was air and some gravity; that they removed the sand equipment on the light cars some thirteen years ago. He didn't think there had been any improvements since; that the foot sanders on the heavier cars are very similar to those that were taken off the light cars. The sanders operated very similarly on the two classes, the light and the heavy, and the purpose of the sand in each is the same; that they kept them on the big cars because they were harder to stop. He says he recognizes that sand is necessary for safety in the operation of street railways at certain places, and it is simply the best way of getting it there. The purpose of sanding a track is to keep the wheels from slipping; that the car will stop quicker if sanded.

This is practically all the testimony that was offered and admitted, touching the use of sand and sanders on street railway tracks, and this is the testimony on which the jury was permitted to say whether or not the failure, on the part of the defendant, to use sand on its tracks at the point in question, or to place sanders upon its cars, was actionable negligence rendering the company liable for the injury sus-

1. MASTER AND SERVANT: safe place to work: sanding street car tracks: negligence.

tained by the plaintiff under the circumstances detailed in this case.

The only statute in force at the time of this accident touching the use of the sanders upon street railways was Chapter 52 of the Acts of the 33d General Assembly, which reads as follows:

"Every . . . company . . . operating a street railway in this state shall equip every double-truck passenger car of thirty-seven feet and more in length over all, or weighing thirty-five thousand pounds or more, purchased, built, or rebuilt hereafter, with power brakes other than hand capable of bringing such car to a stop within a reasonable distance, together with equipment for sanding rails of any street railway, which brake and sand equipment shall be controlled and operated by the motorman on said car." (A violation of this section is punishable by fine.)

Chapter 38 of the Acts of the 34th General Assembly was not passed until after this accident occurred, and is, therefore, not to be considered in determining any duty of the company in respect to the matter in controversy, but neither of these statutes attempts to regulate or control the duty of the operator of a street railway in respect to cars such as the car in controversy here. There was no statutory duty resting on the defendant, at the time of this accident, to place sanding devices upon cars of the character of the one that caused the injury. Chapter 38 of the Acts of the 34th General Assembly only relates to cars of over thirty-two feet in length. This car, the record shows, was under thirty-two feet in length. In failing to place sand upon the car in question, the company, therefore, did not violate any duty imposed upon it by the statute. If it can be held liable at all for its failure to sand the tracks, or to place sand devices upon the car, it must be found in its common law duty to its employees, to furnish them a reasonably safe place to work and reasonably safe

appliances with which to perform the work. At common law it was the duty of the master to exercise reasonable care to furnish the servant a reasonably safe place to work, in discharging the duties imposed upon him by the master.

There is no question in this case that the plaintiff, at the time of the injury, was in and about his master's business, at the place and in the place designated by the master in which to perform the services required of him. He was exposed to hazard from incoming cars in the event the rails became slippery. This might be considered a hazard incident to his employment, providing, however, the master, by the exercise of reasonable care for the safety of the servant, could not have removed the danger. Negligence always presupposes a duty. The duty here that rested on the master was to exercise reasonable care to furnish the servant a reasonably safe place to work. These cars came and went by the direction of the master. They were brought to this barn and housed in this barn by the direction of the master. These tracks were laid and these doors prepared and made for that purpose. Behind these doors and in front of these tracks, the plaintiff was required to work. The evidence discloses that these tracks were exposed to weather conditions; that these tracks, under certain conditions of the weather, became slippery and cars were liable to slide and slip, and the motorman lose control.

The jury might well have found under this record that reasonable prudence and care require that these tracks be sanded at the point where the motorman was required to stop before entering the barn; that ordinary care on the part of the master required this to be done for the safety of the servant. It appears that tracks exposed as these were on that night, under the weather conditions that existed, do become slippery, and when they do, the car in the hands of the motorman passes beyond his control; that the devices provided by the company for stopping the car were not reasonably sufficient against the known effect of the changing weather conditions at that season of the year and at that time of the

night. The master is chargeable with knowledge that climatic influences occasionally will produce conditions which are apt to endanger the safety of the instrumentalities which are reasonably secure in normal weather.

Whether under all the circumstances disclosed here the defendant company was negligent in not anticipating that these rails might become dangerous through climatic influences upon them, and in not providing against it, is not a question of law but a question of fact, and is, therefore, for the jury. See *Shumway v. Burlington*, 108 Iowa 424, 427; *Balhoff v. Ry. Co.*, 65 N. W. (Mich.) 592.

It is no answer to say that the master did not know that climatic conditions *had* produced changes which imperiled the servant. There is still a question whether or not the master, by the exercise of reasonable care for the safety of the servant, could and should have known of the existence of the dangers, so that by the exercise of reasonable care and thoughtfulness for the servant's safety he might have remedied the condition by the exercise of reasonable diligence before the disaster.

It is true that the master, in providing for the safety of his servant, is not required to anticipate and guard against every possible danger. He is only required to use such reasonable care, take such reasonable precaution to prevent accident or injury, as a reasonably prudent person would take or adopt to avoid the danger. The duty which the law imposes upon the master is to use ordinary care and supervision of the instrumentalities employed in or about which the servant is required to work, so as not to unreasonably or unnecessarily expose the servant to hazards which reasonable foresight could have anticipated and reasonable care guarded against.

We think, under the showing here made, that the court did not err in overruling defendant's motion to instruct the jury to return a verdict for the defendant.

We next come to consider whether or not the court erred in the trial of the cause, and in the making of the record upon

which the case was finally submitted to the jury. The first
contention of appellant relates to the action

2. APPEAL AND
ERROR: trial:
exclusion of
evidence
otherwise
brought out.

of the court in receiving evidence over the
objection of the defendant, and in refusing
evidence offered by the defendant claimed to
have been pertinent to the issue. Upon this question appellant
assigns seventeen distinct errors. A careful re-reading of
the entire record satisfies us that there was no error preju-
dicial to the rights of this defendant in the first fifteen errors
assigned, for the reason that every matter sought to be elicited
by the defendant from its witnesses, and to which objections
were interposed and sustained, was fully brought out in other
portions of the same witness' testimony, and the error, there-
fore, in sustaining the objection, if error, was not prejudicial
to any rights of the defendant in this cause.

The defendant's next complaint is that the court erred
in permitting plaintiff's counsel to read from the deposition
of one Dougherty. It appears that sometime prior to the trial
the plaintiff had taken the deposition of

3. WITNESSES:
ancient rule
against im-
peaching one's
own witness:
modification
recognized.

Dougherty, and that this deposition was on
file in the clerk's office at the time of the trial.
This trial was commenced on the 16th day of
April, 1912. For some reason which is not
apparent in the record, witness Dougherty was present in
the court room at the time of the trial. This precluded plain-
tiff from using his deposition, so he called Dougherty on the
stand in rebuttal, and the record thereupon disclosed the
following:

In answer to questions propounded by plaintiff's counsel,
Dougherty answered: "I live at Waterloo. Am street car
conductor, and have been for about seventeen months. I was
conductor the night Doran got hurt. I never operated a car
on this track before I was conductor." Q. "Now then, when
you were conductor on that line, I would ask you whether
or not it is true that the only places sand was put upon the
tracks was at the Illinois Central crossing and the waiting

station?" A. "I cannot just think of anywhere else just now. My deposition was taken March 27th." Q. "To refresh your recollection, I will read this question." (Defendant objected to the reading of any part of the deposition as being incompetent, the witness having been produced by the plaintiff and put upon the witness stand. This was overruled.) Q. "This to refresh your recollection. I will read a couple of questions, and then no doubt you can remember better." Counsel for defendant said: "I want my objection there again to the reading and the ruling upon it by the court." (No ruling.) Plaintiff's counsel then read from the deposition as follows: Q. "In other words, did the company have a regular sand brigade that worked upon the track in different places from time to time?" A. "Yes, sir." Q. "How many men?" A. "Sometimes they had one, sometimes more." Q. "How would they operate? Would they ride from place to place on the car, I mean from a bad place here in one place and sand that up and then go to some other place where it needed sanding?" A. "Yes, sir." "Now after hearing that testimony that you swore to on the 27th day of March, I would ask you whether or not you can recall other places besides the place at the station and at the railway track?" (This was objected to by defendant's counsel and a motion made to strike from the record what had been read from the deposition by counsel for the same reason as urged before.) By the court: "Well, he may answer the question." A. "No, I cannot." Q. "You cannot remember any others?" A. "No, sir."

Cross-examination: "The two places that were sanded, as I remember, were at the Illinois Central crossing and just east of the Fourth street bridge, and at the waiting station."

It is apparent from this record that Dougherty was in the employ of the defendant company at the time of the accident and at the time of the trial; that plaintiff had taken his deposition on the 27th day of March. It is not urged, nor have we any reason to assume, that the witness did not in that

deposition testify substantially as read by counsel. Assuming that he did, it is apparent that he had changed his attitude, to the surprise and disappointment of counsel. His presence in the court room is not accounted for. It, however, prevented the plaintiff from reading the deposition to the jury as substantive evidence of the facts therein related. The witness was not called by the defendant, although the testimony given by him upon this trial is quite in accord with defendant's contention, and against the contention of the plaintiff. Counsel for the plaintiff, taken no doubt by surprise, resorted to the deposition for the purpose of refreshing the witness' memory from the deposition itself.

This deposition, we must assume, was taken in good faith by the plaintiff for the purpose of use upon the trial, and for the purpose of producing evidence as to the substantive fact therein inquired about. Counsel, lulled into security as to what this witness would say on this point, and having every reason to believe that his testimony would be in accord with the other testimony given by him, and by plaintiff's other witnesses, called him to the stand. For some reason, which the record does not fully explain, but which may be inferred, the witness changed front. His testimony on the stand absolutely contradicts the statements made by him in the deposition. His testimony given on the stand supports defendant's contention and rebuts plaintiff's. Defendant has the benefit of his testimony so given for what it is worth. Does reason or fairness suggest that the door should be shut on the plaintiff, that the plaintiff should be held bound by this testimony, without an opportunity to explain the circumstances under which he was induced to call the witness as his own? Should he not be permitted to point out the manner in which the pit was dug into which he fell? To hold a party bound by testimony so fraudulently imposed upon him would be a travesty on justice, and would make the rule, that a party cannot impeach his own witness, a door through which wrong or error may enter and truth be shut out. When it is so apparent in

the record that plaintiff's counsel was trapped by the witness into placing him upon the stand, the rule that prevents the introduction of statements, contrary to his testimony given on the stand, ought to be, in some degree at least, relaxed; that is, where one induces the other to place him upon the witness stand in the belief, founded upon his previous statements, that he will testify to a certain fact as existing, and then when called flatly denies the existence of the fact, the party ought not to be held bound by his testimony without an opportunity to expose to the jury the conditions and circumstances and the facts which led up to the calling of the witness. We are not without authority on this point in this state. All counsel tried to do here in this case was to refresh the witness' memory by calling his attention directly to the former testimony given by him, which was on file in the cause at the time, but which plaintiff was not permitted to use as substantive testimony.

In *Hall v. C. R. I. & P. Ry. Co.*, 84 Iowa 311, a condition such as we have here confronted the court. In that case, the plaintiff, for the purpose of proving his theory of the case, called a witness named Collins. Collins, when examined, testified to a state of facts diametrically opposed to the theory upon which plaintiff rested his case, and to establish which, Collins was called. The plaintiff then produced a written statement signed and sworn to by Collins, and the witness was asked whether he did not sign this writing, which was read to him in the presence of the jury. The witness first denied that he signed it, and then finally admitted that he did sign it. He was then asked if he did not state to other parties certain facts, which were in the line of plaintiff's contention, and he answered both questions in the negative. Error was assigned upon the action of the court in permitting the plaintiff to cross-examine this witness in this way after he had been called for and in behalf of the plaintiff. The court said: "It is the general rule that a party cannot impeach his own witness by introducing evidence

which tends to show that he is unworthy of belief. . . .
When a party is surprised by the testimony given by his wit-
ness, the attention of the latter may be called to the time and
place where it is claimed he made contrary statements. This
is not for the purpose of laying the foundation for impeach-
ment, but to probe and quicken the recollection of the witness,
and to give him an opportunity to correct his testimony, if it
is erroneous, and to show that it has surprised the party who
called him (citing authorities). The district court was within
the rule in permitting the examination of Collins as to the
statements he had made and the paper he had signed.'' See
also *Humble v. Shoemaker*, 70 Iowa 223; *State v. Cummins*,
76 Iowa 133; *Spaulding v. C. St. P. & K. C. Ry. Co.*, 98 Iowa
205; *State v. Walker*, 133 Iowa 489.

The general doctrine here under consideration is very
aptly put in 30 Am. & Eng. Encyc. Law, 1130, under the
head, ''Party Entrapped by Hostile Witness,'' in which it
is said:

''It frequently happens that a party is entrapped into
calling a hostile and unscrupulous witness, who has given
one account of a state of facts before the trial, but gives a
materially different account on the witness stand. This cir-
cumstance has given rise to much discussion, and no little
contrariety of opinion, as to how far a party thus surprised
and deceived may impeach such a witness by proving his state-
ments out of court. If a witness unexpectedly gives material
evidence against the party who called him, such party may,
for the purpose of refreshing the memory of the witness and
awakening his conscience, ask him if he did not, on a particu-
lar occasion, make a contrary statement''—citing authorities.

Under the heading, ''Proof of Prior Inconsistent State-
ments,'' we quote from the same authority as follows:

''Thus far the authorities are agreed, but the question
is, should the inquiry stop here. If the witness admits that

he has made a contrary statement, there is, of course, no necessity for other evidence of it, and, according to many weighty decisions, if he denies making the imputed statement, the party cannot be allowed to prove it by other witnesses where it would not be admissible as independent evidence, and can, therefore, have no effect but to impair the credit of the witness with the jury. On the other hand, it has been urged with much reason that a party should not thus be placed at the mercy of a designing witness, and there are many cases in which it is held that where a party has been surprised and entrapped by his own witness, the court may, in its discretion, allow him to call other witnesses to prove that such treacherous witness had previously made statements contrary to his testimony, not for the purpose of proving the truth of such previous statements, but to show the treachery of the witness, and to set the party right before the jury. To this effect is the great weight of modern authority.''

So it is apparent that many courts have adopted a broader rule than has been recognized in this state, and a broader rule than we are required to invoke to sustain the action of the court in the instant case. We think there is no reversible error in the action of the court in permitting the reading of this deposition, under the facts and circumstances disclosed in this case, and in view of the purpose for which it was used.

The defendant next complained of the action of the court in giving to the jury instructions 3, 7½, 8 and 9.

4. TRIAL: instructions: stating grounds of negligence: non-necessity to repeat.

To intelligently consider instruction 3, it is necessary for us to go back to the instructions given by the court in which the issues were stated to the jury upon which the cause was submitted. Instruction 3, complained of, reads as follows:

"Before the plaintiff can recover in this action, it must be proven by the weight or preponderance of the evidence introduced upon the trial: (1) That the defendant was negligent in some one or more of the respects alleged by plaintiff, and that by reason thereof, plaintiff was injured substantially in the manner and at the time alleged by him."

The complaint of this instruction is that the jury was left to determine for itself in what respect plaintiff alleged that defendant was negligent, and it is said in argument that this instruction left it to the jury to search through the pleadings to ascertain in what respect the plaintiff alleged that the defendant was negligent. Now it is apparent that in many cases this complaint might be well taken, but it is elementary that the instructions must be read together. Reading this instruction in connection with the one next to the one immediately preceding it, the jury could not have misunderstood what the court meant when it said, "He must prove by the weight or preponderance of the evidence that the defendant was negligent in some one or more of the respects alleged by the plaintiff."

In its preceding instruction, the court said, in substance, that the plaintiff claims that the negligence of the defendant which caused his injuries consisted in this: A failure to put sand upon the track where it approached the barn where the car was compelled to stop, and in failing to equip its car which caused the injury with a sand box or sand equipment so that sand could be put upon the track by the motorman, and in operating this car without sand or sand equipment upon a slippery track at said place, and at too great a rate of speed in view of the condition of the track and the lack of sand or sand equipment. Surely, the court having stated the grounds of negligence upon which plaintiff predicated his right to recover, it was not necessary for the court to repeat those grounds in order that they might know what the court meant when it said that the plaintiff must prove that the

defendant was negligent in some one or more of the respects alleged by the plaintiff.

The court followed this instruction immediately by giving the jury a legal definition of what constituted negligence. We think there was no error here.

In the seventh instruction the court said to the jury:

"If you believe from the evidence that the injury to the plaintiff resulted to him by mere accident, and without any fault or negligence on the part of the defendant, then the plaintiff cannot recover in this action. The defendant is not an insurer of the safety of its employees, and it is only liable where injuries are incurred without fault on the part of the person injured, and because of negligence on the part of the defendant. The fact that plaintiff was injured is not, in itself, evidence which tends in the slightest degree to show that the defendant was negligent."

5. TRIAL: instructions: stating affirmative and negative proposition: sufficiency.

In instruction 8 the court said to the jury:

"The defendant is not bound to equip its cars with the best or latest appliances, but it is defendant's duty to furnish appliances such as reasonably prudent men provide under similar or like circumstances. It is for you to say from the evidence which has been introduced upon the trial whether or not, under the circumstances and conditions disclosed by the evidence, the defendant, in the exercise of reasonable and ordinary care and diligence, should have had this car equipped with a sand box or sand equipment so that sand could have been put upon said track by the motorman, or should, on the night in question and before the injury, have in some way caused sand to be put upon the track at the approach to said barn. If you find from the evidence that the defendant should have done so, and that the injury to the plaintiff was caused as the direct and proximate result of defendant's failure to do so, and that plaintiff was not himself guilty of

contributory negligence, as explained elsewhere in these instructions, then the plaintiff is entitled to recover in this action; otherwise not.''

By the use of the words, "otherwise not," the jury must have understood (assuming that they had a reasonable understanding of the English language) that, if they found from the evidence the converse of the proposition above stated, then their verdict must be for the defendant.

It must be borne in mind that instructions submitted to the jury are given for the purpose of guiding the jury in the discharge of its duty *under the record made*. There is no contention in this case that this car had sand boxes; there is no contention that the defendant had put sand upon the track at the place where the car approached the barn, or that any provision was made that night for sanding the track at that point, either from the car or otherwise. Indeed, the evidence completely negatives any such suggestion. Therefore, the only question for the jury to determine was, as the record then stood, whether or not, under the circumstances and conditions disclosed by the evidence, the defendant, in the exercise of reasonable care for the safety of its employees in the barn, should have had its cars equipped with sand, or should have caused sand to be put upon the track at the place where the car approached the barn. The court said to the jury that if they found that reasonable and ordinary care for the safety of the employees required the company to put sand upon the track (it being admitted that it did not do so), and that this omission was the proximate cause of plaintiff's injury, then the plaintiff was entitled to recover; but that if, under all the facts and circumstances disclosed, reasonable care for the safety of the employees did not require the company to put sand upon the track, either through the instrumentality of cars or otherwise, on the night in question, and at the place where the car approached the barn, then the plaintiff could not recover, even though the failure to do so was the proximate

cause of his injury. This is the simple meaning of the eighth instruction. It gave the jury a correct guide in the application of the facts as they were in the record.

The ninth instruction, complained of, reads as follows:

"Under the evidence, it was the duty of the motorman, Hartman, to approach the barn with his car under control so that he could make a reasonably quick stop at any time after he left the line on Broadway, and before he reached the barn, and if said motorman failed to perform this duty, and if plaintiff was injured as a result of the negligence of said motorman alone, and without any fault or negligence on the part of the defendant company, then plaintiff is not entitled to recover, and in that event, your verdict should be for the defendant. If, however, the motorman, Hartman, was negligent and the defendant was also negligent, as alleged by plaintiff, and if plaintiff, without contributory negligence on his part, was injured as the direct and proximate result of the concurrent negligence of said Hartman and defendant, then plaintiff is entitled to recover."

6. MASTER AND SERVANT: concurrent negligence of fellow servant and master: statement of rule: instructions: hypercritical objection.

This instruction is criticised because the court said to the jury that, if the plaintiff was injured as a result of the negligence of the motorman alone, and without any fault or negligence on the part of the defendant company, plaintiff is not entitled to recover; and from this it is argued that the court impliedly said to the jury that if any cause, in any way, without any negligence on the part of the defendant, concurred with the negligence of the motorman in causing the injury, the company would be liable; that is, although the company was not guilty of any negligence on its part, if other causes than the negligence of the company concurred with the negligence of the motorman in causing the injury, the defendant is liable. There would, of course, be no liability on the part of the company if the injury was the result of

the negligence of the motorman, for he was a fellow servant with the plaintiff. The master is not liable for the negligence of a fellow servant, and, therefore, if there were other causes concurring with the negligence of the motorman, the defendant would not be liable, unless it was responsible for the other concurring cause. The criticism is not just. This part of the instruction presents the negative proposition that, if the company was not at fault, or not negligent, and the jury found that the motorman was negligent, and that his negligence was the proximate cause of the injury, the plaintiff could not recover. The jury are distinctly told in the last part of this instruction under consideration that, if the motorman was negligent, and the company was negligent, as charged, and the injury was the proximate result of the concurrent negligence of both, then the plaintiff is entitled to recover; that to hold the defendant liable, they must find that the company was negligent, and that this negligence was the concurring cause, with the negligence of the motorman, in producing the injury, and that the jury could not return a verdict for the plaintiff unless they found affirmatively that the defendant was guilty of the negligence charged, and that this negligence was a concurring cause in producing the injury.

It is claimed, however, that the instruction is not full enough, in that it does not state that the intervening or concurring cause which would render the company liable must be one that the company should, by the exercise of reasonable care, have anticipated or apprehended. But the jury had been told this before, and there was no occasion for repeating it. This instruction must be read in connection with all the instructions, and what was here said in this instruction must be construed and interpreted in the light of what preceded and followed.

We think there was no error committed by the court here that justifies a reversal of the cause. See *Walrod v. Webster County*, 110 Iowa 349, and cases cited.

The defendant complains of the action of the court in giving to the jury instruction 7½, which reads as follows:

"If you fail to find from the evidence that the defendant company had actual knowledge of the slippery condition of the track, or that, by the exercise of reasonable and ordinary care, taking into consideration the weather conditions which ordinarily exist at that season of the year, it should have had actual knowledge thereof, such a length of time before the accident that it could, in the exercise of reasonable care, have taken steps reasonably necessary to prevent an accident, then the defendant is not liable for the injury received by the plaintiff, and in that event your verdict should be for the defendant.

7. TRIAL: instructions: placing undue emphasis on certain evidence.

"On the other hand, if you find from the evidence that the defendant did have, or by the exercise of reasonable and ordinary care should have had, such knowledge for such a length of time as above suggested, then the defendant was negligent, and if the injury to the plaintiff was caused as the direct and proximate result of defendant's negligence, and if plaintiff was himself not guilty of contributory negligence, then the plaintiff is entitled to recover in this action."

8. TRIAL: instruction inartificially drawn: test to apply.

The defendant complains of the first paragraph of this instruction on the ground that it unduly emphasizes weather conditions in determining whether or not the defendant should have anticipated that the track was or was likely to become slippery; that in doing so the instruction ignored facts favorable to the defendant, such as that the tracks were level; that the rules required motormen to run slowly over them, holding the car well under control, and that there had been no prior trouble upon the track, etc. It is not contended by the defendant that if the jury failed to find from the evidence that defendant had actual knowledge of the slippery condition they might not then proceed to determine

whether or not, by the exercise of reasonable and ordinary care, it should have had such knowledge for such a length of time before the accident that, with reasonable care, steps could be taken to prevent the accident; that, in determining this, they might take into consideration the weather conditions which ordinarily exist at that season of the year; but the contention is that the court should have gone farther and called attention to other facts which might have had probative force upon the determination of this question, such as here before suggested.

The law which governs the rights of the parties and which is essential, under the facts in a case, to a proper determination of the rights, must be given to the jury fairly and fully, as a guide to them in reaching a correct result under the law. The law does not require that the rule be phrased in any particular way, nor that it be phrased with rhetorical and grammatical accuracy. The thought involved in a rule lies back of the expression of it, through the instrumentality of speech. Language is only for the purpose of conveying to the minds of others the thought existing in the mind of the speaker or the writer. Any language which conveys to the mind of the other a correct understanding of the thought, though inartificially and ungrammatically conveyed, is sufficient. A rule of law may be stated in various ways without impinging upon the rule. To one mind, a thought is conveyed more intelligently and clearly when phrased in one way. Another mind grasps it more intelligently when phrased differently. The real purpose in phrasing a thought is to convey to the mind an intelligent understanding of the thought. In instructing a jury, it is the duty of the court to lay down those rules of law which have been recognized and approved, and which are essential to a proper disposition of the rights of the parties. As evidence is the means through which there is conveyed to the mind the knowledge of the existence or nonexistence of a particular fact, so the instructions of the court are the instrumentalities through which

there is conveyed to the minds of the triers of the fact, a knowledge of the law by which they must be guided in determining the ultimate right. The law requires that these rules be correctly stated by the court, but does not require that they be expressed or phrased in any particular way. It is sufficient if, to a man of ordinary intelligence, a correct understanding of the law is given in the whole charge. It goes without authority to say that the statement of an incorrect rule or one that guides to a wrong conclusion is prejudicial. It goes without argument to say that the statement of inconsistent rules which lead to inconsistent conclusions when applied is error.

In the ordinary intercourse between men, the subject-matter of the controversy or discussion must be always kept in mind in interpreting the language used. It is quite impossible in conveying a thought to so extend and amplify the thought by expression that there could be no possible controversy as to the interpretation of the language used. What is said and what has preceded has much to do in determining what was intended to be conveyed by the speaker, and what was understood by the hearer. The hearer is presumed to have understood what was said in the sense in which men of ordinary intelligence understand such expressions, and presumed to have given the words used that interpretation which men of ordinary intelligence usually give to the language used. Never, however, in construing language must the subject-matter concerning which it was used be lost sight of,— what preceded and followed,—the knowledge the parties had of the subject-matter under discussion.

We are not disposed to reverse a case because the manner in which the rule is stated, or because the language used in stating the rule, when considered abstractly and apart from the record, might receive an interpretation other and different than that which the true rule requires. We cannot disassociate the instructions from the record then before the court and the jury, and consider it as a statement of an

abstract proposition of law. If the rule stated is a sufficient guide to the jury, as to the law that governs them in the particular case under the record made, it is sufficient for the purposes of the case, though not perhaps full enough to express the abstract proposition.

We find in this case no question as to the injuries received by the plaintiff. It is not contended that the plaintiff was guilty of any contributory negligence. The undisputed evidence shows that the tracks were slippery on this night. It shows that the condition of the tracks was due to climatic changes. It is shown that on damp, frosty nights rails, whether on the level or upon a hill, become slippery; that this fact was known to the defendant company; that when tracks are slippery cars will slip and slide forward in spite of any effort on the part of the motorman with the ordinary appliances to prevent their so doing; that the usual and ordinary method recognized for stopping cars, under conditions such as this record discloses, is by sanding the tracks.

On this particular night, this car was brought to the barn for the purpose of being housed. The doors to the barn were closed. Plaintiff was behind these doors engaged in and about the work assigned him. The jury could have well found, and, we have no doubt, did find, that if the motorman was in the least degree careless in approaching this barn without sand upon the tracks, the car was liable to push forward, after the brakes were set, into and against this door. As to all these facts, there is practically no dispute in the record. There was no sand put on this track and no provision made for sanding it. The plaintiff predicated the liability of the company and urged his right to recover upon the ground that the defendant had failed to sand these tracks at this point. This was the negligence charged, and this was the omission of the defendant upon which liability was predicated.

While this instruction is inartificially drawn and might have been amplified and made fuller, we do not find that it did not fairly express to the jury the rule that should govern

them upon the question there treated. The serious criticism urged against the instruction is lodged against the second division of the instruction, and it is claimed that the court undertook to tell the jury that certain omissions constituted negligence; that this was within the province of the jury to determine from all the facts. This is ordinarily true, but not always true. The court, in this division of its instruction, in substance said:

"On the other hand, if you find from the evidence that the defendant, by the exercise of reasonable and ordinary care, should have had such knowledge of the slippery condition of the track for such a length of time before the injury that it could, in the exercise of reasonable care, have taken steps reasonably necessary to prevent the accident, then the defendant is negligent under such circumstances in failing to take steps reasonably necessary to prevent the accident."

Certainly that is true. Under any fair interpretation of the instruction, the court does not say that this is the actionable negligence charged, or that this is all the negligence necessary to be shown to create a liability. The court had already fully explained to the jury what the negligence charged was, and what acts or omissions to act constituted the negligence upon which plaintiff predicated his right to recover, and had told the jury that, unless plaintiff sustained by his evidence one or the other of those omissions or commissions charged as constituting actionable negligence, plaintiff could not recover, and the court proceeded in this instruction, "and if the injury to the plaintiff was caused as a direct result of defendant's negligence, then the plaintiff is entitled to recover."

We do not feel that the criticism of this instruction and the interpretation urged by the plaintiff is justified under the whole record. We believe, considering the whole record and the other instructions, the court fairly expressed the law which should guide the jury in its deliberation. Not only

must both parts of this instruction be read and considered together, but the whole record must be considered in determining whether or not prejudicial error was committed. While we feel that the instruction was inartificial, and not as full as it might be made, yet in view of the whole record we cannot reverse upon this ground.

It is next contended that the verdict is excessive. We cannot say that this verdict was the result of passion and prejudice. It has support in the evidence. We do not feel justified in reversing on this ground.

The judgment is, therefore,—*Affirmed.*

LADD, WEAVER, EVANS and PRESTON, JJ., concur.

DEEMER, C. J. (dissenting).—The majority, while condemning instruction No. 7½ given by the trial court, finally conclude that, although inartificially drawn, it was without prejudice, because of other instructions and because of the entire record in the case. I cannot in justice to myself concur in this view. Had the instruction been advisory only, and not intended to cover the entire case, I might be disposed to concur because of the other instructions in the case; but as it was not, it must be regarded as in conflict with other instructions covering the same point, and therefore erroneous. If an instruction purporting to cover the entire case is wrong, it cannot be cured by other instructions; for, in the absence of special findings, there is no method whereby to discover which instruction the jury followed; and, as the verdict may have been based upon the erroneous one, it should be set aside and a new trial ordered.

Under the facts of this case, there being no statute requiring the sanding of tracks or the equipping of the particular car in question with a sand box or sand equipment, it was wholly a question of fact for the jury to determine whether or not defendant was negligent in these respects, because of its failure to sand the track or to equip its car with a sand

box or other sand equipment. The majority concede that the statute relied upon by appellee does not apply to the case, because the car was not of the required size. The trial court would not have been justified in instructing, under the facts disclosed, that defendant was negligent, as a matter of law, because its car was not equipped with a sand box, or because it did not sand the track at the place of the accident. *Shumway v. City of Burlington,* 108 Iowa 424. But, to my mind, it substantially did this very thing. This instruction, as I read it, is as follows:

"If you find from the evidence that the defendant did have, or by the exercise of reasonable and ordinary care should have had, knowledge (of the slippery condition of the track) for such a length of time (before the accident, that it could in the exercise of reasonable care have taken steps reasonably necessary to prevent the accident), then the defendant was negligent; and if the injury to the plaintiff was caused as the direct and proximate result of defendant's negligence, and if plaintiff was himself not guilty of contributory negligence, then the plaintiff is entitled to recover in this action."

As already stated, this instruction is complete in itself and leaves nothing open to intendment, or to be supplied by other instructions. Thereunder, defendant was expressly declared to be guilty of negligence if it had, or by the exercise of reasonable and ordinary care should have had, knowledge of the slippery condition of the track a sufficient length of time before the accident so that it could have taken steps to prevent the same. That this was erroneous should, I think, be conceded. Although defendant had, or should have had, this knowledge, it by no means follows as a matter of law that defendant was negligent. That question, as the majority say at the beginning of the opinion, was one of fact for a jury; because the statute quoted does not apply. It was manifestly for the jury to say, from all the circumstances disclosed, whether or not, with knowledge of the slippery condition of

the track, defendant was negligent in not sanding it, or in not equipping its car with a sand box. If the jury followed this instruction, as we must assume that it did, it must have found its verdict upon the thought that defendant knew or should have known of the slippery condition of the track; and although under other instructions this might not have been sufficient, still, as they are contradictory, the giving of the erroneous one calls for a reversal of the judgment. The negligence of the defendant under this instruction was clearly made out, if the jury found that defendant knew, or should have known, of the slippery condition of the track a sufficient length of time before the accident so that it could have prevented the same. The case must turn not on the negligence of the man in charge of the car which caused the accident, for he was a mere fellow servant of plaintiff, for whose acts defendant was not responsible. To hold defendant liable, it would have to be shown to the satisfaction of the jury that, under all the circumstances, defendant did not use ordinary and reasonable care in furnishing plaintiff a reasonably safe place to work, or with reasonably safe appliances with which to perform the work which he was then doing. Whether or not such care and prudence were exercised was a question of fact for the jury and not of law for the court. The employee in charge of the car knew that it was not equipped with a sand box, and knew that the track was slippery and had not been sanded, and the accident may have been due wholly to his want of ordinary care in handling the car; and, if this were true, defendant was not responsible unless it also was in fault in not furnishing a reasonably safe place to work, and this fault was the proximate cause of the accident.

The majority concede these rules, as I understand it, but still say that the only fault with the instruction is that it was inartificially drawn and should be construed with others which did announce the proper doctrine. In my opinion, this view runs counter to many of our previous cases. The rule heretofore has been that an erroneous instruction

covering the entire case cannot be cured by other instructions which announce the correct rule. *Quinn v. R. R. Co.,* 107 Iowa 710; *Haradon v. Sloan,* 157 Iowa 608, 611; *Lauer v. Banning,* 140 Iowa 319; *Thayer v. Coal Co.,* 121 Iowa 121; *Christy v. R. Co.,* 126 Iowa 432; *Blake v. R. R. Co.,* 149 N. W. 880*; *Meyer v. Boepple Button Co.,* 112 Iowa 51; *Martin v. Light Co.,* 131 Iowa 724, 734. The *Meyer Case, supra,* is very closely in point. That the instruction now being considered is erroneous sufficiently appears from the majority opinion, and that it cannot be defended upon any theory is to me very plain. And to my mind, it is equally clear that neither the facts disclosed by the record nor the other instructions given by the trial court cured the error.

The most that can be said of the other instructions is that they announced correct rules; but in so doing, they are in square conflict with the one which is now being considered. No matter how many times the court may have said in other instructions that the question of negligence was one for the jury, in 7½ it squarely said that, if the defendant had, or should have had, knowledge of the slippery condition of the track in time to have prevented the accident, it was guilty of negligence, and if this negligence caused the injury, and plaintiff was not guilty of contributory negligence, he was entitled to recover in this action.

What does it matter that in other instructions the jury was told that the question of defendant's negligence was for it to determine? How long would it consider that question in the face of instruction 7½? It was its duty, under this last instruction, to find defendant guilty of negligence, if it knew or should have known of the slippery condition of the track in time to have prevented the accident. Whatever may be said of the limitations upon the human language and of the understanding of the hearers and the readers thereof, we must not overlook its fair import when used in instructions to juries. To my mind, there is absolutely no room for con-

---

*Not yet officially reported.

struction.  The instruction is as clear as words can make it; and even if others were correct, they were necessarily in conflict with the one I have quoted.  Conflicting instructions have always been regarded as erroneous, and have so many times been disapproved that I need only cite the following late cases upon the proposition.  *Benton v. Brown,* 145 Iowa 604; *Stewart v. R. R. Co.,* 136 Iowa 182; *Romans v. Thew,* 142 Iowa 89; *Blake v. Miller,* 135 Iowa 1; *Brusseau v. Brick Co.,* 133 Iowa 245.

For the errors pointed out, I would reverse.

SALINGER, J.—I concur in the dissent of DEEMER, C. J.